**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KAREN PEISKER and <br> WILLETTA TAYLOR, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED PARCEL SERVICE, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 03 C 4593 <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiffs Karen Peisker and Willetta E. Taylor bring suit against their employer United Parcel Service (UPS) for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and the Age Discrimination in Employment Act, 29 U.S.C. § 626(c). Plaintiffs, who worked as feeder drivers,[1] contend that UPS discriminated against them based on their sex, race, and/or age in displacing them from their home facilities during layoffs in 2001 and 2002 and in refusing to allow them to remain in the facilities to which they were displaced during those layoffs. Plaintiffs also assert that the UPS's layoff policy under the current collective bargaining agreement disproportionately impacts female and minority feeder drivers. UPS has moved for summary judgment on all of the plaintiffs' claims. For the reasons outlined below, the Court grants UPS's motion.

---

[1] Feeder drivers driver semi-tractor trailers for UPS.

**Facts**

UPS has three districts in the Chicago metropolitan area or Tri-District – Metro Chicago, the Chicago Area Consolidation Hub (CACH), and North Illinois. Metro Chicago has three facilities (Jefferson Street, Northbrook, and Franklin Park); North Illinois has two facilities (Addison and Palatine); and CACH, the largest UPS facility in the country, is its own district.

Over 12,500 UPS employees within UPS's Tri-District are members of International Brotherhood of Teamsters Local 705, and the employment relationship between UPS and these employees is governed by collective bargaining agreements negotiated between UPS and Local 705. Landem Decl. ¶¶ 4-10. Two collective bargaining agreements are relevant to this case: the 1997-2002 collective bargaining agreement (Old CBA) and the 2002-2008 collective bargaining agreement (New CBA). The New CBA effective date was August 1, 2002, but it was ratified in October 2002. Peisker Pl. 56.1 Resp. ¶¶ 11-12.

Plaintiffs were assigned to the Northbrook facility in the Metro Chicago district. Peisker Def. 56.1 Stmt. ¶ 16. During 2001 and 2002, plaintiffs were laid off from their positions due to a lack of work. Under the Old CBA, feeder drivers were given three options when laid off. They could bump the least senior feeder driver in the Tri-District, bump the least senior package driver (the job classification below feeder driver), or accept a layoff subject to recall.

Due to a shortage of work in July 2001, Peisker was laid off along with two other feeder drivers, Keith Collins and Rob Distenfield. Each of these individuals was given three options. They could move into a temporary new feeder driver position at CACH, bump into a package car driver position at Northbrook, or take the layoff and collect unemployment compensation. Peisker Dep. at 29-30. Peisker contends that under the Old CBA, she should have been given the

option to bump into other facilities as a feeder driver and that she was improperly refused a copy of the master feeder list so that she could understand and fully exercise her bumping options. Peisker Decl. ¶ 5. From the options she was given, Peisker, like Distenfield, took the lower-paying package car driver position at Northbrook, while Collins took the temporary feeder driver position at CACH. Peisker Dep. at 30.

In February 2002, Peisker requested to bump the least senior feeder driver at Addison, which she was allowed to do for a few weeks. She was then moved, without explanation, to a feeder driver position at Palatine. After working at Palatine for thirty days, Peisker requested the right to bid on an open feeder driver position at that facility but was not allowed to do so. Peisker Decl. ¶¶ 11-14.

Eventually, Peisker was forced to return to Northbrook, where she experienced another layoff in December 2002. During this layoff, which was governed by the New CBA, Peisker was given the option of doing two part-time jobs at the Jefferson Street facility or taking a layoff. She opted for the layoff. Peisker Dep. at 32-35.

In February 2002, Taylor was laid off from her position as a feeder driver at Northbrook. At that time, feeder drivers were being laid off across the Metro Chicago district and CACH. Taylor Dep. at 38. Taylor was told to report for a feeder driver position at Palatine. She states, however, that the least senior feeder drivers were at CACH and that three more junior male feeder drivers were allowed to go to CACH when she was told to report to Palatine. Taylor Decl. ¶ 3.

During the 2002 layoff, Taylor worked at the Palatine and Addison facilities during periods when she was not on worker's compensation leave (which was much of April through

August). Taylor Dep. at 40. She attempted to make bids on permanent positions when she was at Palatine, but she was not allowed to do so. It appears that Taylor eventually returned to Northbrook, but she, like Peisker, was laid off again in December 2002, and she opted to take the layoff rather than working two new jobs. Taylor Dep. at 40-42, 76-79.

**Discussion**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving part[ies] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When evaluating a motion for summary judgment, the Court must view the facts in favor of the non-moving parties and draw all reasonable inferences in their favor.

In an employment discrimination case involving allegations of disparate treatment, a plaintiff can survive summary judgment by proffering either direct or indirect evidence of discrimination on the part of the employer. *See, e.g., Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). Plaintiffs contend that UPS discriminated against them in two ways: first, by not providing them with bumping options that correlated with their seniority when they were initially laid off, and second, by not allowing them to bid on permanent positions at the facilities to which they were displaced during the layoff.

Plaintiffs proffer no direct evidence of discrimination, so we proceed to assess their claims using the familiar *McDonnell Douglas* burden-shifting standard. Under this standard, a plaintiff can establish a prima facie case of discrimination by showing that she is a member of a protected class, performed her job satisfactorily, suffered an adverse employment action, and

4

was treated less favorably than a similarly situated individual who was not a member of the protected class. *See, e.g., Greenslade v. Chi. Sun-Times, Inc.*, 112 F.3d 853, 863 (7th Cir. 1997).

There is no dispute that plaintiffs are members of protected classes and that they performed their jobs satisfactorily both before and during the layoff. Plaintiffs contend they suffered adverse employment action when they were initially laid off and when they were not permitted to bid for permanent positions to remain at the facilities to which they were displaced. UPS did not attack plaintiffs' claims on this basis in its opening memorandum; its belated raising of the point in its reply is insufficient to require its consideration. We therefore turn to the question of whether plaintiffs have offered evidence from which a reasonable jury could find that similarly situated persons outside their protected classes were treated better than the plaintiffs. Plaintiffs must proffer evidence that similarly situated individuals who were not members of plaintiffs' protected classes (i.e. males, non-African-Americans, and individuals under forty) were treated more favorably than plaintiffs under these circumstances. *See Radue v. Kimberly Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

On the claim that plaintiffs were not provided with bumping options that correlated with their seniority, Peisker concedes that the individuals who were laid off when she was – Collins and Distenfield – were given the same options she was. Peisker Dep. at 29-30. Only Taylor identifies workers she claims were treated more favorably than her. Specifically, she argues that "male drivers junior to [her], including Pete Carter, Al Clark, Ron Jones, John Cohran, Keith Collins, Reginald Fleming and Darryl McArther, were allowed to bump into CACH." Pl. Resp. at 7.

5

UPS seems to agree that these individuals – all of whom were laid off in 2002 – were similarly situated, but it contends they were treated the same as Taylor, not more favorably. Specifically, UPS argues that pursuant to the Old CBA, each of these feeder drivers was, like Taylor, given the option of bumping the least senior feeder driver in the Tri-District. Because the identity and location of the least senior feeder driver constantly shifts during progressive layoffs, however, the location to which a newly laid off feeder driver could transfer was constantly changing. Taylor proffers no evidence that any of these men bumped anyone other than the person who was the least senior feeder driver in the Tri-District at the particular time. For these reasons, no reasonable jury could find that UPS provided Peisker and Taylor with less favorable bumping options than other laid off feeder drivers.

We turn next to the claim that plaintiffs were not allowed to bid on permanent positions at the facilities to which they were displaced during the 2002 layoff and were subsequently forced to return to Metro Chicago. On this claim, both plaintiffs cite several similarly situated individuals who they contend were treated more favorably: Keith Collins, Tim Curry, someone named Kavitch,[2] R. Kramer, Don Simone, and Jim Weaver.

Initially, no reasonable jury called find that several of these individuals were situated similarly to the plaintiffs. First, unlike Peisker and Taylor, Curry, Kramer, and Weaver had their home domiciles in North Illinois, were not subject to the 2002 layoffs, and were therefore supposed to be working as feeder drivers in North Illinois both before and after the layoffs.

---

[2] We ignore Kavitch for purposes of this analysis. Plaintiffs assert that he was moved from Metro Chicago to Addison but provide no other information about him or the circumstances of his transfer. In fact, UPS states that it cannot find an employee named Kavitch in its records.

Peisker and Taylor state in their affidavits that these individuals had their home domiciles in Metro Chicago, but in contrast to UPS's witness Gary Landem, who is UPS's Metro Chicago labor manager, there is nothing to indicate that Peisker and Taylor had personal knowledge of the other workers' home domiciles. *See* Peisker Aff. ¶ 14; Taylor Aff. ¶ 6; Landem Supp. Decl. ¶ 1, 10. Thus, because there is no admissible evidence that Curry, Kramer, Weaver had the same home domicile as the plaintiffs, and because they were not laid off during the times relevant to this case, they are not similarly situated for the purpose of establishing discrimination based on gender, race, and age. *See Radue*, 219 F.3d at 617-18.

The remaining allegedly comparable workers are Don Simone and Keith Collins. In 1992, Simone was temporarily moved from the Bedford Park facility to the Northbrook facility. He was offered the opportunity to return to Bedford Park, but he refused and decided to remain at Northbrook. Fleming Pl. Ex. B. In 2001, Collins was laid off from Northbrook; he was offered the opportunity to bump into a temporary new position at CACH; and he took that position. At some time, Collins's position became permanent, and Collins, UPS, and Local 705 agreed that Collins should be able to bid for the position and change his home domicile to CACH.

Defendants provide a single argument to differentiate Simone and Collins from Peisker and Taylor: Simone and Collins were not laid off during the major layoffs of 2002. With regard to Simone, we agree that no reasonable jury could find that a worker who permanently changed facilities almost ten years before the events at issue in this case is situated similarly to plaintiffs. With regard to Collins, however, a jury reasonably could find that Collins – who also originated in Metro Chicago, was laid off at the same time as Peisker and less than a year before Taylor,

7

and was able to obtain a permanent position in the district to which he was displaced – was a similarly situated employee who was treated more favorably than plaintiffs. *See Radue*, 219 F.3d at 617-18 (noting similarly situated employees are those who obtained the desired position around the same time as plaintiffs sought it and had "analogous attributes, experience, education, and qualifications").

UPS states that it had non-discriminatory reasons for allowing Collins to remain permanently at CACH: though Collins was part of a small-scale layoff involving three workers, Peisker and Taylor were part of larger-scale layoffs involving approximately one hundred workers that lasted through 2002. Neither Peisker nor Taylor, however, offer any evidence from which a reasonable jury could find that this reason was pretextual or effectively "dishonest." *See Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005). Rather, defendant persuasively argues that it was in a position to allow Collins alone to transfer permanently but that it would have been impossible to do so with almost one hundred feeder drivers in layoff status following the layoff to which the plaintiffs were subjected. For this reason, the Court grants summary judgment in favor of UPS on plaintiffs' disparate treatment gender discrimination claims and Peisker's disparate treatment age discrimination claims.

In their complaint, plaintiffs also contend that UPS's policy of requiring laid off feeder drivers to return to their home domicile has a disparate impact on women and racial minorities. In their response to defendant's motion for summary judgment, however, plaintiffs focus entirely on their contention that they suffered from disparate treatment and do not discuss the claim that the policy had a disparate impact. Plaintiffs offer no evidence to satisfy their initial burden of demonstrating these groups are adversely affected by UPS's required return policy: they provide

no evidence, such as employment records, about the genders and races of UPS employees in the Tri-District or the feeder drivers who have been affected by this policy. *See Price v. City of Chicago*, 251 F.3d 656, 660 (7th Cir. 2001). The Court therefore grants summary judgment in favor of UPS to the extent plaintiffs' gender and race discrimination claims are based on a disparate impact theory.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [docket no. 37]. The Clerk is directed to enter judgment for the defendant.

_____
MATTHEW F. KENNELLY
Date: January 9, 2006                              United States District Judge